IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TOMMY EDWARDS,               )
                             )
                Plaintiff,   )
                             )
        v.                   )      1:13CV43
                             )
CAROLYN W. COLVIN,           )
Acting Commissioner of Social )
Security,                    )
                             )
                Defendant.   )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

   Tommy Edwards brings this action pursuant to 42 U.S.C.
§ 405(g) to obtain judicial review of a final decision of the
Commissioner of Social Security (the "Commissioner") denying his
claim for Supplemental Security Income ("SSI") benefits under
Title XVI of the Social Security Act (the "Act"). (Doc. 2.) The
parties have filed cross-motions for judgment on the pleadings
(Docs. 11, 16), and the administrative record has been certified
to the court for review. For the reasons set forth below, the
Commissioner's motion will be granted, Edwards' motion will be
denied, and this case will be dismissed.

I.  **BACKGROUND**

   On November 15, 2009, Edwards was admitted to the hospital
after suffering a complex fracture of his right ankle. (Tr. at

271-72.)[1]  His injuries were severe enough to require multiple surgeries and the installation of stabilizing hardware in his leg. (See id. at 278-86.)  His initial hospitalization lasted five days. (See id. at 271.)

After his initial discharge from the hospital, Edwards failed to properly care for his wounds.  (See id. at 459 (noting that Edwards continued to smoke and drink and that he had "miss[ed] multiple appointments").)  As a result, Edwards remained unable to walk without the assistance of a four-pronged walker five months after his initial injury.  (See id. at 406.)  By May 2010, radiology revealed that, although the fracture itself had healed, Edwards suffered from "demineralization" in his ankle, "likely secondary to disuse."  (Id. at 449-50.)  Edwards also failed to change the dressing on his wounds as frequently as directed by his doctors. (Id. at 392.)

By July 2010, Edwards developed osteomyelitis and other complications, requiring a six-week hospitalization to allow his wounds to heal properly.  (See id. at 459, 421-22.)  During this second hospitalization, doctors also removed screws and other medical hardware from Edwards' ankle.  (Id. at 421-22.)  On September 15, 2010, Edwards reported that he was ambulatory, and

---

[1] Transcript citations refer to the Administrative Transcript of Record filed manually with the Commissioner's Answer.  (Doc. 7.)

his doctors observed that he had achieved a "satisfactory outcome in terms of wound healing." (Id. at 431.)

Edwards filed an application for SSI benefits on December 15, 2009, one month after his original injury. (Id. at 81.) On June 4, 2010, the Commission denied his claim. (Id. at 96.) Edwards requested reconsideration, and the Commission denied his claim again on September 8, 2010 after an independent review by additional physicians. (Id. at 107.) Thereafter, Edwards requested a hearing de novo before an Administrative Law Judge ("ALJ"). (Id. at 12.) After reviewing the record and conducting a hearing, the ALJ concluded that Edwards was not disabled within the meaning of the Act. (See id. at 12–21.) On November 13, 2012, the Appeals Council denied Edwards' request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for the purposes of judicial review (id. at 1).

In rendering his disability determination, the ALJ first found that Edwards was not engaged in substantial gainful activity. (Id. at 14.) The ALJ next found that Edwards suffered from the following severe impairments: "chronic right ankle pain, status-post open reduction and internal fixation complicated by deep vein thrombosis and osteomyelitis; personality disorder; somatization disorder; and a history of alcohol abuse." (Id.) The ALJ found that these impairments did not meet or medically equal any of the impairments listed in 20 C.F.R. §§ 416.920(d), 416.925, and

3

416.926.  (Id. at 15.)  Most pertinent to this appeal, the ALJ concluded that Edwards' ankle injury did not qualify as "major dysfunction of a joint" as that term is defined in Listing 1.02 because "the record does not show that he is unable to ambulate effectively."  (Id.)

The ALJ next found that Edwards has the residual functional capacity ("RFC") to perform "medium" work as that term is defined in 20 C.F.R. § 416.967(c), except that:

> [H]e can only occasionally push, pull, and operate foot controls using his right lower extremity; he cannot climb ladders, ropes, and scaffolds; he can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; and he should avoid concentrated exposure to hazards, such as unprotected heights and moving machinery.

(Id. at 16.)  Finally, after considering Edwards' age, education, work experience, and RFC, the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that the claimant can perform."  (Id. at 20.)  Specifically, the ALJ found that Edwards was capable of working in "unskilled, medium occupations, such as auto detailer . . . and hand packer."  (Id. at 20-21.)  Thus, the ALJ determined that Edwards was not disabled within the meaning of the Act.  (Id. at 21.)

## II.  ANALYSIS

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006).  However,

4

"the scope of . . . review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (citations omitted) (internal brackets omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "[I]t consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (quoting Laws, 368 F.2d at 642) (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Social Security Commissioner]." Mastro, 270

F.3d at 176 (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)) (internal brackets omitted). "'Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner or the ALJ].'" Hancock, 667 F.3d at 472 (quoting Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005)). The issue before this court, therefore, "is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig, 76 F.3d at 589.

In undertaking this limited review, the court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)).

> Under this process, the Commissioner asks, in sequence,
> whether the claimant: (1) worked during the alleged
> period of disability; (2) had a severe impairment; (3)
> had an impairment that met or equaled the requirements
> of a listed impairment; (4) could return to her past
> relevant work; and (5) if not, could perform any other
> work in the national economy.

Id. The claimant bears the burden as to the first four steps, but the Commissioner bears the burden as to the fifth step. Id. at 472-73.

In undertaking this sequential evaluation process, the five steps are considered in turn, although a finding adverse to the claimant at either of the first two steps forecloses a disability designation and ends the inquiry. In this regard, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

"If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals

---

all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

or exceeds in severity one or more of the impairments listed in Appendix I of the regulations." <u>Mastro</u>, 270 F.3d at 177. If a claimant carries his burden at each of the first three steps, the claimant is disabled, and there is no need to proceed to step four or five. <u>See</u> <u>id.</u> Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then the analysis continues and the ALJ must assess the claimant's RFC. <u>Id.</u> at 179.[3]

Step four then requires the ALJ to assess whether, based on that RFC, the "impairment prevents the claimant from returning to past work"; if so, the claimant does not qualify as disabled. <u>See</u> <u>id.</u> at 177. However, if the claimant establishes an inability to return to prior work based on that RFC, the analysis proceeds to the fifth step, which shifts the burden of proof and "requires the Commissioner to prove that a significant number of jobs exist which

---

[3] "RFC is a measurement of the most a claimant can do despite his limitations." <u>Hines</u>, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). RFC includes a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." <u>Hall</u>, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (<u>e.g.</u>, pain)." <u>Hines</u>, 453 F.3d at 562-63.

the claimant could perform, despite his impairments." <u>Hines</u>, 453
F.3d at 563.  In making this determination, the ALJ must decide
"whether the claimant is able to perform other work considering
both his [RFC] and his vocational capabilities (age, education,
and past work experience) to adjust to a new job." <u>Hall</u>, 658 F.2d
at 264-65.  If, at this step, the Commissioner cannot carry her
"evidentiary burden of proving that [the claimant] remains able to
work other jobs available in the community," the claimant qualifies
as disabled.  <u>Hines</u>, 453 F.3d at 567.

   Here, Edwards does not contend that the ALJ applied an
improper legal standard.  Similarly, Edwards does not challenge
any of the ALJ's factual findings with regard to his personality
disorder, somatization disorder, or alcohol abuse.  Instead,
Edwards argues that the ALJ erred in step three of the sequential
evaluation process by finding that Edwards' ankle injury does not
satisfy the criteria for "major dysfunction of a joint," as that
term is used in the pertinent regulations.  In addition, Edwards
contends that the ALJ erred in step five by finding that Edwards
has the RFC to perform medium work, lift up to fifty pounds, and
walk or stand for six hours in an eight hour workday.

   **A.   Major Dysfunction of a Joint**

   Edwards first challenges the ALJ's finding that his ankle
injury does not meet or exceed any of the impairments listed in
the pertinent regulations.  Specifically, Edwards contends that

9

his ankle injury qualifies as "major dysfunction of a joint," as that term is defined in Listing 1.02 of the regulations. See 20 C.F.R. Part 404, Subpart P, Appendix I. If Edwards' injury qualifies under that Listing, then he is disabled for the purposes of the Act and there is no need to consider his RFC or ability to work. See Mastro, 270 F.3d at 177.

Major joint dysfunction is "characterized by gross anatomical deformity," "chronic joint pain with signs of limitation of motion" and "joint space narrowing, bony destruction, or ankylosis." 20 C.F.R. Part 404, Appendix 1, Listing 1.02. When the injury involves a weight-bearing joint, such as an ankle, the injury must also "result[] in inability to ambulate effectively." Id. An individual cannot ambulate effectively if he relies on "the use of a hand-held assistive device(s) that limits the function of both upper extremities" while walking. Id. at Listing 1.00B2b(1).

Here, the ALJ found that Edwards can walk without the assistance of a walker, and therefore concluded that his ankle injury does not qualify under Listing 1.02. (Tr. at 15.) In reaching this finding, the ALJ noted that Edwards' medical records state that he was ambulatory within twelve months of his original injury. (Id.) The ALJ also noted the absence of any "objective medical evidence" that a walker was "medically necessary" for Edwards at the end of the twelve-month period. (Id.) Instead, the ALJ observed, Edwards' doctors recorded only manageable pain

10

while walking, described his gait as only "mildly antalgic," and prescribed "no assistive device apart from a custom-molded shoe." (Id.)

Edwards disagrees with the ALJ's finding, citing medical records and other evidence that suggest he cannot walk without the aid of a walker. Most of this evidence predates his second hospitalization. (See Doc. 12 at 7–8 (citing Tr. at 216, 299–302, 310–13, 406, 449–52).) During this period, Edwards' "social condition . . . preclude[ed] proper healing of [his] wound." (See Tr. at 386.) By contrast, Edwards' second hospitalization resulted in the removal of hardware from his ankle and proper care for his wound. (See Tr. at 427–28, 431.) As a result, Edwards' condition improved dramatically after his second hospitalization. (See id.) Thus, the ALJ could reasonably assign greater weight to the records reflecting Edwards' progress in the period between his second discharge and the one-year anniversary of his accident. (See id. at 18 ("The function reports filed by [Edwards] and a relative are consistent with his allegations, but were prepared prior to his most recent surgery, and [Edwards'] records demonstrate significant medical improvement since that time.").) The other evidence cited by Edwards consists primarily of his own testimony before the ALJ, along with one medical record in which he complained of acute pain that was exacerbated by standing or walking. (See Doc. 12 at 7–8 (citing Tr. at 36–39, 45–46, 421).)

11

Although relevant, the ALJ could reasonably conclude that this evidence was not credible in light of the other medical records, which characterize Edwards' pain as manageable, note that he could walk with only minor modifications to his gait, and prescribe specialized shoes rather than a walker to assist him. (See Tr. at 418, 427–28.) Even if a reasonable mind could reach a different conclusion, this court cannot simply re-weigh conflicting evidence and substitute another judgment for that of the ALJ. Mastro, 270 F.3d at 176 (quoting Craig, 76 F.3d at 589).

Edwards further argues that, to the extent the ALJ was troubled by the absence of medical records explicitly addressing his alleged need for a walker, the ALJ should have ordered a consultative examination to further explore this issue. (Id. at 8.) This argument is meritless. Although the ALJ has a duty to "explore all relevant facts," the ALJ "is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record." Bell v. Charter, No. 95-1089, 1995 WL 347142, at *4 (4th Cir. Jun. 9, 1995)[4] (per curiam) (citing Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986); Clark v. Shalala, 28 F.3d 828, 830–31 (8th Cir. 1994)). In conducting this inquiry, the ALJ "is entitled to rely not only on what the record says, but also on what it does not say." Dumas v. Schweiker, 712 F.2d 1545,

---

[4] Non-binding unpublished decisions are cited only for the persuasive value of their reasoning.

12

1553 (2d Cir. 1983). Here, the ALJ had adequate information to make his decision based both on what Edwards' medical records said about his recovery and what they neglected to say about his need for a walker. (See Tr. at 418, 427–28.)

Even if the record were incomplete, however, remand would not be appropriate in this case. When an ALJ neglects to compile a complete record, remand is only appropriate if this failure was prejudicial. See Marsh v. Harris, 632 F.2d 296, 300 (4th Cir. 1980). Thus, in order to show that remand is appropriate, the claimant must establish that "additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision." Ripley v. Chater, 67 F.3d 552, 557 n.22 (5th Cir. 1995); see also Young v. Astrue, No. 1:09CV1008, 2013 WL 474787, at *5 (M.D.N.C. Feb. 7, 2013). Here, Edwards points to no additional evidence of his need for a walker, relying instead on information that has already been considered and rejected by the ALJ. (See Doc. 12 at 8–9.) Moreover, at the hearing before the ALJ, Edwards' counsel represented that the administrative record was complete. (Tr. at 29.) As a result, Edwards cannot now reverse course and argue that the record should have been expanded. See Maes v. Astrue, 522 F.3d 1093, 1097 (10th Cir. 2008) (stating that a claimant represented by counsel cannot "rest on the record" and "later fault the ALJ for not performing a more exhaustive investigation").

13

In sum, the ALJ inquired into Edwards' functioning and found that he is able to ambulate effectively without a walker. In reaching this finding, the ALJ reasonably considered both what the medical records say (e.g., that Edwards was able to walk with a "mild antalgic gait" and could benefit from wearing specialized shoes) and what the medical records do not say (i.e., that Edwards needs a walker). Even if reasonable minds could reach a different conclusion based on older medical records and Edwards' testimony, this evidence is not so overwhelming as to preclude a reasonable mind from reaching the ALJ's conclusion in light of the record as a whole. The court therefore concludes that the ALJ's finding was supported by substantial evidence.

## B. Residual Functional Capacity

Edwards next challenges the ALJ's finding that his RFC permits him to perform medium work, lift up to fifty pounds, and walk or stand for six hours in an eight hour workday. Edwards raises two objections to this finding. First, he contends that the ALJ relied too heavily on the opinion of a non-examining physician. Second, Edwards argues that the ALJ improperly discredited Edwards' own testimony about his pain and physical limitations. The court will consider these issues in turn.

Edwards first argues that the ALJ relied too heavily on the opinion of Dr. Ellen Huffman-Zechman, a non-examining physician who reviewed Edwards' medical records as part of the Commission's

14

reconsideration process. (See Tr. at 88–90.) On September 3, 2010, Dr. Huffman-Zechman wrote that, although Edwards' ankle injury was "traumatic in onset," the wound "seem[ed] to be healing." (Id. at 89.) Based on these observations, she opined that Edwards' injury was "not expected to be disabling for a continuous 12 months" and predicted that Edwards would have the RFC to stand or walk six hours in an eight hour workday twelve months after his injury. (Id. at 88–91.) The ALJ found Dr. Huffman-Zechman's assessment to be "well supported and . . . consistent with the other evidence of record," and therefore afforded her opinion "great weight." (Id. at 19.)

Edwards argues that the ALJ should have discredited Dr. Huffman-Zechman's opinion because it relied on the premise that his ankle would heal. According to Edwards, his ankle never healed, and actually worsened over time. To support this assertion, Edwards notes that in November 2010, two months after Dr. Huffman-Zechman delivered her opinion, x-rays revealed "advanced degenerative changes" in his ankle. (Id. at 427–28.) These changes left Edwards with "severe deformity" in his right ankle. (Id. at 422.) Moreover, because of his history of infection and other complications, this deformity cannot be corrected through additional surgery. (See id. at 428.) Thus, Edwards argues, the ALJ should not have relied on Dr. Huffman-Zechman's opinion because she did not have the benefit of the

15

November 2010 x-rays and therefore wrongly predicted that Edwards'
condition would improve.

Contrary to Edwards' assertions, however, Dr. Huffman-
Zechman's prediction about Edwards' ongoing symptoms turned out to
be right. Edwards reported being ambulatory as early as September
2010, when his doctors observed a "satisfactory outcome in terms
of wound healing." (Id. at 431.) By November 2010, a treating
physician found that, despite the degenerative changes in his ankle
structure, Edwards was "able to ambulate weight bearing as
tolerated on the right hand side with a mild antalgic gait." (Id.
at 427.) Noting that Edwards exhibited "improved mobility," the
doctor recommended that Edwards manage his pain with special shoes
and over-the-counter Tylenol. (Id. at 427-28.) Thus, Dr. Huffman-
Zechman correctly predicted that any residual medical problems
Edwards might experience would not be functionally disabling
twelve months after his accident, and the ALJ could reasonably
rely on her opinion with regard to Edwards' RFC. See Gordon v.
Schweiker, 725 F.2d 231, 235 (4th Cir. 1984) (stating that an ALJ
may rely on the testimony of a non-examining physician when it is
consistent with the record).

Finally, Edwards argues that the ALJ improperly discredited
his testimony about his pain and physical limitations. When
assessing the credibility of subjective testimony, the ALJ should
consider "all of the evidence presented, including information

16

about [the claimant's] prior work record, [the claimant's] statements about [his] symptoms, evidence submitted by [the claimant's] treating or nontreating source[s], and observations by [the Commission's] employees and other persons." See 20 C.F.R. § 416.929(c)(3). This includes the "degree to which the individual's statements are consistent with . . . information provided by medical sources, including information about medical history and treatment." SSR 96-7P, 1996 WL 374186, at *5 (July 2, 1996). When an ALJ ultimately finds subjective testimony not to be credible, the ALJ must state his reasons for doing so and support his determination with specific evidence from the record. Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

An ALJ may not reject claims of disabling pain "'*solely* because the available objective evidence does not substantiate [the claimant's] statements' as to the severity and persistence" of his pain. Craig, 76 F.3d at 585 (emphasis and alteration in original) (citing 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2)). "This is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain." Id. "Although a claimant's allegations about [his] pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence." Id.

17

Here, Edwards testified that he cannot walk for more than twelve feet without a walker, suffers from severe chronic ankle pain, and cannot stand for more than fifteen minutes at a time. (Tr. at 39, 43-46.) The ALJ concluded that although Edwards' "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms" were not entirely credible because they were inconsistent with the objective evidence in the record. (Tr. at 18.) First, the ALJ discredited Edwards' testimony because that testimony was inconsistent with the objective observations of Edwards' own doctors, who documented what appeared to be a substantial recovery. (See id. at 18-19.) The ALJ also discounted Edwards' complaints of debilitating ankle pain because Edwards himself often reported needing "only over-the-counter medication" to manage that pain. (Id.) Edwards' ability to manage his symptoms with over-the-counter medication provides substantial evidence to support the ALJ's finding. See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling.")[5] Finally, the ALJ

---

[5] The ALJ also stated that Edwards "has not attempted other treatments, such as physical therapy or pain management, as one might expect from a person who is experiencing debilitating symptoms." (Tr. at 18.) The ALJ most likely based this observation on Edwards' own testimony that he "didn't ever take physical therapy." (Id. at 42.) Edwards also testified that his physicians told him that he didn't need physical therapy because they thought he could "probably try to walk again."

noted that Edwards "had not worked for several years prior to his injury," which suggests that his limited functioning was likely "attributable to factors other than his alleged impairments." (Tr. at 18.)[6]

The court notes that Edwards did appear to suffer some sort of setback roughly thirteen months after his accident. In December 2010, Edwards reported severe ankle pain and stated that this pain was exacerbated by walking and standing. (See id. at 421–25.) The ALJ attributed this setback to problems with Edwards' specialized shoes, rather than his ankle. (See id. at 18.)[7] But even if the problem was unrelated to Edwards' shoes, this setback appears to have been an anomaly in an otherwise positive recovery

---

(Id.) But Edwards's medical records show that he actually did participate in physical therapy, though only for a short period following his initial injury. (See id. at 299–302, 311–13.) It is possible that the ALJ meant to state only that Edwards had not participated in physical therapy recently, or after his second hospitalization. Regardless, to the extent that the ALJ may have erred in relying on the absence of physical therapy, such error was harmless because other substantial evidence supports the ALJ's decision to discredit Edwards' testimony. See Kramitz v. Colvin, No. 6:11-CV-2037-CMC-KFM, 2013 WL 681898, at *2 (D.S.C. Feb. 22, 2013).

[6] Edwards has not worked since the textile factory at which he worked closed in 2001, eight years before his ankle injury. (Tr. at 35.)

[7] Edwards incorrectly asserts that the ALJ "omitted mention" of Edwards' pain complaints in December 2010 and February 2011. (Doc. 12 at 7–8.) In fact, the ALJ discussed these complaints at some length. The ALJ explained, "[Edwards] reported increased pain [in December 2010] a few weeks after he began using the [specialized] shoe, and the emergency department physician instructed him to have it checked. Since then, he has reported some mild pain when walking but has not reported the significant loss of function that he described at the hearing." (Tr. at 18.)

19

trend.  One month before the setback, Edwards exhibited improved mobility with a "mild antalgic gait," despite the deformity in his ankle.  (Id. at 427.)  Similarly, two months after the setback, Edwards experienced "some pain" and his "wound appear[ed] to have healed completely."  (Id. at 418–19.)  Three months after the setback, Edwards reported only "minor pain in [his] ankle for which he takes an occasional Tylenol."  (See id. at 411–12.)  Edwards' treating physician concluded, "At this point, [Edwards] is no longer immobile, asymptomatic, and progression of [his deep vein thrombosis] seems unlikely.  We will not pursue any further workup or treatment at this time."  (Id. at 412.)  In light of this objective evidence, the ALJ could reasonably conclude that Edwards' pain and injuries were not as debilitating as he claimed twelve months after his injury.  See Craig, 76 F.3d at 595.  Even if a reasonable mind could reach a different conclusion, this court cannot simply re-weigh conflicting evidence and substitute another judgment for that of the ALJ.  Mastro, 270 F.3d at 176 (quoting Craig, 76 F.3d at 589).

In sum, the ALJ could reasonably give "great weight" to Dr. Huffman-Zechman's opinion regarding Edwards' RFC because her opinion is consistent with the improved functional capacity reflected in Edwards' medical records ten to sixteen months after his accident.  By the same token, even if Dr. Huffman-Zechman's opinion were entitled to no weight at all, the ALJ's finding would

still be supported by substantial evidence because it is consistent with those same medical records. Moreover, Edwards' testimony and the inferences he seeks to draw from the deformity in his ankle, while relevant, are not so overwhelming as to preclude a reasonable mind from reaching the ALJ's conclusion in light of the record as a whole. Thus, the court concludes that the ALJ's findings regarding Edwards' RFC are supported by substantial evidence.

## III. CONCLUSION

For the reasons stated, the court finds that the factual findings of the ALJ, which were adopted by the Commissioner, are supported by substantial evidence and were reached through application of the correct legal standard.

IT IS THEREFORE ORDERED that Edwards' motion for judgment on the pleadings (Doc. 11) is DENIED, the Commissioner's motion for judgment on the pleadings (Doc. 16) is GRANTED, and this action is DISMISSED WITH PREJUDICE.

    /s/    Thomas D. Schroeder
United States District Judge

December 16, 2015